UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DONALD R EUBANKS, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3:11-CV-432 |
| | § | |
| KOKILA NAIK, *et al*, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Donald Eubanks, a paraplegic inmate who suffered serious injuries while incarcerated, sued a number of defendants for their alleged role in his injuries.  These three remain: the Texas Department of Criminal Justice (TDCJ) and two TDCJ doctors, Kokila Naik and Aftab Ahmad.   Two claims are pending: an Americans with Disabilities Act claim against TDCJ, and a constitutional claim for deliberate indifference against Naik and Ahmad.  As a threshold matter, TDCJ and the doctors assert in their summary judgment motions that Eubanks's claims are barred because Eubanks did not exhaust his state administrative remedies prior to filing suit.  Only Naik and Ahmad also seek summary judgment on the merits. The doctors argue that they provided Eubanks with constant treatment, were not deliberately indifferent to his medical needs, and are entitled to a qualified immunity defense.

1

I.    **BACKGROUND**[1]

   **A. Eubanks Arrives at Jester III Unit**

   Though a car accident in 1982 rendered him a paraplegic, Eubanks was generally in good health when he entered into the custody of the Galveston County Sheriff's Office in August 2009.    Docket Entry No. 89-1 at 1.  For roughly a month prior to his transfer to TDCJ's Jester III Unit in Brazoria County—the prison unit at the center of this lawsuit—he was housed in the Galveston County Jail, where he began developing painful skin injuries known as decubitus ulcers. On September 19, 2009, he was sent to TDCJ's Byrd Unit.  Four days later, he was transferred to Jester.  After reviewing the results of Jester's Medical and Mental Health Screen and a letter from Eubanks's physician that recommended that Eubanks be taken to a hospital as soon as possible, Dr. Ahmad signed off on the transfer to Jester, found that no immediate referral to a hospital was necessary, and ordered that Eubanks continue to stay on his normal medications.  Eubanks stayed at Jester from September 23 to October 27, during which time he was under the medical supervision of Ahmad and Naik.

   When Eubanks arrived at Jester, he was suffering from multiple decubitus ulcers as well as uncontrolled diarrhea.  *Id.*  Though he was told he could shower whenever he needed, he was only given two diapers and one catheter for every

---

[1] Given the summary judgment posture, the following recitation of facts resolves all credibility determinations in Eubanks's favor.

three days.   A few days after he arrived at Jester, Naik conducted a medical evaluation of Eubanks as part of TDCJ's Physically Handicapped Offender Program.   Though Naik documented that Eubanks had multiple ulcers and ordered that they be cleaned twice a week, she did not observe if any of the ulcers were infected.   Docket Entry No. 89-2 at 3.   Eubanks asked her how TDCJ was prepared to treat his ulcers without hospital care.   According to Eubanks, Naik "admitted to [him] that she was unable to properly treat [him] at Jester III, but would not agree to transfer [him] to a medical facility at that time."   Docket Entry No. 89-1 at 1.

### B. Eubanks's Condition Deteriorates

After the initial examination, Eubanks's condition quickly degenerated.   On September 30, he sent a Request for Medical Services (I-60) to Ahmad that stated that he had pressure sores on his buttocks and left ankle, was in constant pain, and needed to be transferred to a hospital.   The request was denied.   On October 2, he was sent to a medical technician to have the bandages covering his ulcers changed. When the technician saw that Eubanks's bandages were covered in feces because of his diarrhea, the technician sent Eubanks away without treating him.   On October 4, Eubanks alerted the medical staff at Jester that he was suffering from nausea, vomiting, fever, chills, and diarrhea.   He wrote another I-60 to Ahmad on October 5, stating that he needed help with his daily care and was unable to keep himself clean because he had no bowel or bladder control.   Though Ahmad saw

3

Eubanks on October 7 to investigate his complaints of bladder and bowel incontinence, Ahmad did not look at Eubanks's ulcer wounds during that visit. Docket Entry No. 89-2 at 4.

Eubanks's condition continued to rapidly deteriorate.  In an I-60 that he sent to Naik on October 14, Eubanks advised that because of constant drainage, the bandages protecting his sores needed to be changed 3 to 4 times a day.  He also reiterated that he "desperately needed to be transferred to a hospital setting." Docket Entry No. 89-1 at 2.  In a separate I-60 submitted that same day, Eubanks explained that he had six stage-two pressure sores on his bottom and two stage-three sores on other areas of his body that were not getting any better.  Though the doctors advised him to stay off his bottom, Eubanks explained that he was unable to do so because his daily care activities, such as bathing and eating, required him to sit in his wheelchair.

On October 18, he sent separate I-60s to Naik and Ahmad.  He told Naik that the dressings for his sores were ineffective because they always became saturated with blood.  In the I-60 he sent to Ahmad, he said that the treatment for his sores was ineffective and that several of them were worsening.  Ahmad saw Eubanks the next day, at which time he diagnosed Eubanks's ulcers and obtained a wound culture.  Docket Entry No. 89-2 at 5–6.  Naik saw Eubanks on October 23 and noted that his wounds had worsened.

4

On October 27, after complaining of feverish conditions and swollen testicles, Eubanks was transferred from Jester to the University of Texas at Galveston Medical Branch (UTMB), where he was diagnosed with a stage-four decubitus ulcer and probable osteomyelitis. In order to prevent Eubanks from dying from the ulcer wounds, the surgeon amputated both of Eubanks's legs at the hip, removed a portion of his colon, resectioned his scrotum, and removed one of his testicles. Docket Entry No. 89-1 at 1.

### C. Eubanks Files a Grievance

On April 19, 2010, while he was recovering from the amputation at the TDCJ's Carole Young Medical Facility, Eubanks submitted a Step 1 Offender Grievance Form to TDCJ. In the grievance, he alleged that Ahmad and Naik allowed his ulcers to become infected, which is what led doctors at UTMB to have to perform the emergency surgery. Docket Entry No. 89-5 at 1. TDCJ rejected his Step 1 grievance on June 9, explaining in detail why it believed Ahmad and Naik had responded appropriately to Eubanks's medical needs.

On June 23, Eubanks filled out a Step 2 Offender Grievance Form in which he reiterated his previous complaints and challenged TDCJ's rejection of his Step 1 grievance. On August 2, TDCJ denied the Step 2 grievance, explaining that its "[appellate] office concur[ed] with" the Step 1 findings. *Id.* at 4.

### D. The Lawsuit

Over a year after the rejection of his Step 2 grievance, Eubanks filed this lawsuit. This case has a long and convoluted procedural history, most of which is recapped in an order the Court issued on May 9, 2013.  *See* Docket Entry No. 87. Eubanks previously asserted claims in a Second Amended Complaint[2] under 42 U.S.C. section 1983 and the Americans with Disabilities Act against seven prison officials and TDCJ.[3]  Docket Entry No. 55.  Now, after the Court dismissed several defendants from the case because of Eubanks's failure to respond to various dispositive motions, only two claims remain: (1) a deliberate indifference claim against Naik and Ahmad that is being challenged on exhaustion grounds and on the merits, and (2) an ADA claim against TDCJ that is being challenged solely on exhaustion grounds.[4]

---

[2] He has since filed a Third Amended Complaint that only alleges claims against Naik, Ahmad, and TDCJ.  *See* Docket Entry No. 96 at 2.

[3] Eubanks also brought claims against Galveston County and members of the Galveston County Sheriff's Office, but the parties agreed to dismiss those claims with prejudice pursuant to a settlement agreement.  *See* Docket Entry Nos. 82; 83.

[4] TDCJ did not challenge the merits of Eubanks's ADA claim because it incorrectly read this Court's Order dismissing ADA claims against several individual defendants in their official capacities, *see* Docket Entry No. 71, to also dismiss the ADA claim brought against TDCJ.  But the only claim pending against TDCJ was an ADA claim, Docket Entry No. 55 at ¶ 22, so in filing a summary judgment motion on exhaustion grounds, TDCJ must have understood it was still a defendant in the case.  In its motion, TDCJ also asserted a sovereign immunity defense. Though that defense would succeed if Eubanks were asserting a section 1983 claim against TDCJ, the Supreme Court has held that Title II of the ADA lawfully abrogates a state's sovereign immunity.  *See United States v. Georgia*, 546 U.S. 151, 159 (2006).

## II.   STANDARD OF REVIEW

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment.  *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

While a district court's decision to deny summary judgment in response to a qualified immunity defense is appealable "to the extent that it turns on an 'issue of law,'" a denial of qualified immunity is "'not appealable if [it is] based on a claim regarding the sufficiency of the evidence. . . . Therefore, if the district court concludes that the summary judgment record raises a genuine issue of material fact with respect to whether . . . qualified immunity is applicable, then that decision is not immediately appealable."  *Gobert v. Caldwell*, 463 F.3d 339, 344 (5th Cir. 2006) (quoting *Palmer v. Johnson*, 193 F.3d 346, 350–51 (5th Cir. 1999)).

## III.  DISCUSSION

### A. Exhaustion

If Eubanks did not exhaust all available state administrative procedures prior to filing this federal suit, all his claims fail.[5]  Enacted in 1996 to "address the large number of prisoner complaints filed in federal court," *Bock*, 549 U.S. at 202, the Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This exhaustion requirement gives prison officials the "time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Porter v. Nussle*, 534 U.S. 516, 525 (2002).   The Supreme Court has held that the PLRA requires "proper exhaustion," and the Fifth Circuit has taken a "strict approach" to whether a

---

[5] Failure to exhaust is an affirmative defense, *see Jones v. Bock*, 549 U.S. 199, 216 (2006), which TDCJ raised in its original answer and Naik and Ahmad raised in their answer to Eubanks's Second Amended Complaint.  *See* Docket Entry Nos. 11 ¶ 32; 93 ¶ 30.  Even if they failed to assert exhaustion in their answers to the most current pleadings (and the Court is not sure, as Eubanks asserts, that is the case), the Fifth Circuit has recognized that the oversight "can be excused if the defendant raises the issue at a 'pragmatically sufficient' time and there is no prejudice to the plaintiff."  *Johnson v. Johnson*, 385 F.3d 503, 516 n.7 (5th Cir. 2004) (citation omitted).  Eubanks was aware from the outset that Defendants intended to bring an exhaustion defense and had ample time to respond to their summary judgment motions. *See Coker v. Dallas Cnty. Jail*, 2009 WL 1953038, at *13 (N.D. Tex. Feb. 25, 2009) (finding that exhaustion defense not waived because plaintiff was aware of defendant's intent to bring exhaustion defense and had opportunity to respond to argument in summary judgment briefing).  But because the Court concludes that Eubanks has exhausted his claims, the Court need not reach the question of whether TDCJ actually waived its exhaustion defense or whether the waiver is excusable.

8

prisoner has complied with available state administrative procedures. *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003), *overruled by implication on other grounds by Bock*, 549 U.S. at 214–16.

Texas prisons have "developed a two-step formal grievance process. The Step 1 grievance, which must be filed within fifteen days of the complained-of incident, is handled within the prisoner's facility. After an adverse decision at Step 1, the prisoner has ten days to file a Step 2 grievance, which is handled at state level." *Johnson*, 385 F.3d at 515. A prisoner must pursue both steps for the grievance to be considered properly exhausted. *See id.* (citing *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001)).

Eubanks filed a Step 1 grievance in April 2010, and the behavior it challenged—the doctors' medical treatment when he was an inmate at Jester— occurred six months earlier. Additionally, his Step 2 grievance was filed more than ten days after he received an adverse decision on his Step 1 grievance. His tardiness at both stages of the grievance process thus would appear to bar his federal claims. But Eubanks argues that TDCJ waived its exhaustion defense by responding to and rejecting both of his grievances on the merits.

The Fifth Circuit addressed a similar issue in *Johnson*, in which a prisoner was subjected to repeated sexual assaults over an eighteen-month period beginning in October 2000. He properly filed two grievances through the Step 2 process—

9

one in March 2001 and the other in December 2001.  The Court determined that the March grievance, which was held to exhaust only a claim related to the assault that occurred in the fifteen days preceding it, "alerted prison officials to the fact" that the prisoner was subjected to repeated assaults.  *Johnson*, 385 F.3d at 520.  On notice of the assaults, the prison treated the later December grievance "as a complaint about a continued lack of protection" and thus "did *not* reject this grievance as being an untimely attempt to grieve" events that occurred more than 15 days prior to the filing of the grievance.  *Id.* at 520–21 (emphasis in original) (citing *Gates v. Cook*, 376 F.3d 323, 331 & n.6 (5th Cir. 2004), for the proposition that "prison officials could not argue that a prisoner's grievance failed to comply with procedural rules when the officials had looked past the purported technical defect and rejected the grievance for substantive reasons").  The court therefore held that the December grievance exhausted claims relating to "the same continuing failure to protect" the prisoner from assaults, including an event that occurred several months earlier.  *Id.* at 521.

This case thus presents a question indirectly raised in *Johnson* and addressed in the *Gates* footnote—"whether a grievance that could have been denied for failure to comply with a procedural requirement is nonetheless exhausted for PLRA purposes if the institutional decision-maker instead denied it on the merits." *Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012).  Every circuit to have

addressed this procedural scenario has concluded "that the PLRA's exhaustion requirement is satisfied if prison officials decide a procedurally flawed grievance on the merits." *See id.* (citing cases from the Second, Third, Sixth, Seventh, and Tenth Circuits). The unanimous view of the circuits that have directly addressed this issue rests on solid ground. Proper, timely exhaustion allows agencies to "address[] the issues on the merits," the benefits of which "'include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Hammett*, 681 F.3d at 947 (quoting *Bock*, 549 U.S. at 219). Those benefits "are fully realized when an inmate pursues the prison grievance process to its final stage and receives an adverse decision on the merits, even if the decision-maker could have declined to reach the merits because of one or more procedural deficiencies." *Id.* As Judge Easterbrook explained in a decision that the Fifth Circuit cited with approval in *Johnson*, *see* 385 F.3d at 521, "when a state treats a filing as timely and resolves it on the merits, the federal judiciary will not second-guess that action, for the grievance has served its function of alerting the state and inviting corrective action." *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004).

Because TDCJ responded to and rejected Eubanks's Step 1 and Step 2 grievances on the merits, and thus satisfied the interests that the exhaustion requirement serves, the Court can consider the merits of Eubanks's deliberate indifference claim.[6]

## B. Deliberate Indifference

The Fifth Circuit has described deliberate indifference as "an extremely high standard to meet." *Gobert*, 463 F.3d at 346.  It requires more than negligence— "even gross negligence is not enough." *Brown v. Bolin*, 500 F. App'x 309, 315 (5th Cir. 2012) (citing *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996).  "A prison official acts with deliberate indifference 'only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it.'" *Gobert*, 463 F.3d at 346 (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)).  Thus "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference.  *Farmer*, 511 U.S. at 838.  Instead, a plaintiff must produce evidence showing that a prison official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any

---

[6] In light of this ruling, the Court need not reach Eubanks's argument that TDCJ's grievance procedures were not "available" to him until April 2010 (thus tolling his time to file a Step 1 grievance) because of his medical condition after the surgery.  *Days*, 322 F.3d at 868 ("[A]dministrative remedies are deemed unavailable when (1) an inmate's untimely filing of a grievance is because of a physical injury and (2) the grievance system rejects the inmate's subsequent attempt to exhaust his remedies based on the untimely filing of the grievance.").

similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert,* 463 F.3d at 346.

Qualified immunity, which Ahmad and Naik assert as a defense, "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).   An official's acts violate clearly established law if "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   *Ashcroft v. Al–Kidd,* 131 S.Ct. 2074, 2083 (2011) (internal quotation marks and brackets omitted). The burden is on the plaintiff in each case to demonstrate that the defense is inapplicable.   *See McClendon v. City of Columbia,* 305 F.3d 314, 323 (5th Cir.2002) (en banc) (per curiam). Thus, in each case, the plaintiff must first show that the defendants committed a constitutional violation, and second show that the qualified immunity defense is inapplicable. *Atteberry v. Nocana Gen. Hosp.,* 430 F.3d 245, 253 (5th Cir.2005) (citations omitted).

Because the evidence concerning their respective roles in Eubanks's treatment diverges in one critical respect, the Court addresses his deliberate indifference claims against Ahmad and Naik separately.

### 1. Dr. Ahmad

The evidence shows that Ahmad provided Eubanks with fairly consistent medical care. He responded quickly to Eubanks's calls, diagnosed the decubitus ulcers, proscribed a plan to alleviate the pain the ulcers caused, and was generally available to provide medical care. Indeed, even Eubanks's medical experts use language in their reports that suggests that Ahmad acted negligently, or at worst, with gross negligence, rather than with deliberate indifference. *See, e.g.*, Docket Entry No. 89-2 at 4 (describing a medical exam that Ahmad conducted but criticizing him for failing to look at Eubanks's wounds); *id.* at 6 (concluding that Ahmad "show[ed] indifference to the standards of care for this type of patient, and a lack of perception of the seriousness" of the problem). Though Eubanks's medical experts make conclusory statements that Ahmad was deliberately indifferent, an expert's use of legal terms cannot create a fact issue when the undisputed factual record shows that there is none. *See Wooley v. Smith & Nephew Richards, Inc.*, 67 F. Supp. 2d 703, 711 (S.D. Tex. 1999) ("An expert's mere incantation of legally sufficient words or phrases does not make an expert's opinion admissible.") (alteration, citation, and internal quotation marks omitted)); *cf. Stewart v. Murphy*, 174 F.3d 530, 537 n.8 (5th Cir. 1999) (finding no deliberate indifference based on totality of evidence despite expert testimony that doctors' medical care of plaintiff had, in fact, amounted to indifference).

14

At worst, Eubanks has shown that Ahmad "faile[d] to alleviate a significant risk that [he] should have perceived, but did not." *Domino*, 239 F.3d at 756. There is no evidence that he was subjectively aware of how serious the problems with the ulcers were and responded with wanton disregard. Rather, he appears to have continually made a medical judgment that the ulcers did not require hospitalization. *See Clark v. Adams*, 233 F. App'x 400, 401 (5th Cir. 2007) (dismissing claim when evidence showed, at worst, that doctor was negligent for failing to refer prisoner to a surgery); *O'Neil v. Tex. Dept. of Crim. Justice*, 804 F. Supp. 2d 532, 536 (N.D. Tex. 2011) (dismissing deliberate indifference claim against doctor because evidence only indicated negligence; though doctor allegedly failed to proscribe sufficient medication, decision to provide any additional treatment was matter of medical judgment). Medical judgments like the ones Ahmad made during the course of his treatment of Eubanks do not rise to the level of deliberate indifference. Eubanks's claim against him must therefore be dismissed.

### 2. Dr. Naik

The evidence of Naik's deliberate indifference is in some respects similar to the evidence against Ahmad. But there is at least one significant distinction that, if proven, could lead a jury to conclude that she was deliberately indifferent to Eubanks's serious medical needs. Naik allegedly told Eubanks that she knew that

15

she could not treat him properly at Jester but would not transfer him to another facility. That decision and what happened afterwards therefore could be interpreted as deliberate indifference: Eubanks remained at Jester for another month under Naik's care, and by the end of that month, his condition had completely devolved.

As Naik points out, the Fifth Circuit in *Stewart* held that doctors' treatment of a paraplegic inmate's ulcer wounds—which was similar to the attention Eubanks received—did not amount to deliberate indifference. In *Stewart*, however, there was no evidence that the doctors knew of the seriousness of the plaintiff's ulcers and failed to take action to heal them. And in fact, the court appeared to acknowledge that if such evidence had been offered, it might have found a fact issue. *See Stewart*, 174 F.3d at 535 n.2 (rejecting argument that a note stating that prison hospital could not provide proper treatment for plaintiff was attributable to prison's doctor). In this case, that fact question exists given Eubanks's testimony that Naik told him "she was unable to properly treat [him] at Jester III." Docket Entry No. 89-1 at 1.

If a jury credits what Eubanks says Naik told him during his initial medical exam, Naik would not be entitled to qualified immunity because she would have violated a clearly established constitutional right. "The Supreme Court has counseled the lower courts that 'clearly established law' should not be defined 'at a

16

high level of generality.'" *Pittman-Bey v. Clay*, 2013 WL 797415, at *4 (S.D. Tex. Mar. 4, 2013) (quoting *Al–Kidd,* 131 S.Ct. at 2084 (citation omitted)).  While "an issue does 'not require a case directly on point' to be clearly established,' [] 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Al–Kidd*, 131 S.Ct. at 2083)).  A well-developed and longstanding body of case law places beyond debate "that knowledge of the need for medical care and intentional refusal to provide that care constitutes deliberate indifference."  *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989) (citations omitted); *Lawson v. Dallas Cnty.*, 286 F.3d 257, 262–63 (5th Cir. 2002) (affirming finding of deliberate indifference when nurses disregarded orders regarding how many dressing changes to give paraplegic inmate despite knowing that his wounds were worsening); *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006) (affirming denial of qualified immunity and observing that law is clearly established that refusal to treat prison inmate violates Eighth Amendment); *McCoy v. Tex. Dept. of Crim. Justice*, 2006 WL 2434289, at *7 (S.D. Tex. Aug. 21, 2006) (denying qualified immunity for defendant who failed to treat prisoner "despite evidence that she was aware of his severe symptoms" because "it was well-settled that an officer who ridicules and refuses to treat a prisoner in obvious need of help violates the Eighth Amendment.").

17

There is evidence from which a jury could conclude that Naik was deliberately indifferent to Eubanks's medical needs because she knew his ulcers required transfer to a hospital, but she did not order a transfer.  And because the law is clearly established that "intentional refusal to provide [] care constitutes deliberate indifference," *Mandel*, 888 F.2d at 788, Naik cannot rely on qualified immunity to shield her from liability.  Summary judgment in her favor is therefore improper.

## IV.   CONCLUSION

For the reasons explained above, TDCJ's Motion for Summary Judgment (Docket Entry No. 80) on the ADA claim is **DENIED**. The Motion for Summary Judgment brought by Defendants Naik and Ahmad (Docket Entry No. 74) is **GRANTED IN PART** and **DENIED IN PART**. The deliberate indifference claim against Ahmad is dismissed, while the claim against Naik remains in the case. A subsequent order will schedule a status conference to select a trial date and address other issues.

**SIGNED** this 19th day of March, 2014.

_____
Gregg Costa
United States District Judge